**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ULTRACARE FAMILY WELLNESS OF NY, INC., SHARMIN KHAN RITA, and AMARBIN AHMED,<br><br>*Plaintiffs,*<br>-against-<br><br>ROWAN ADVANCE GROUP LLC, ELI SKLAR, RELIANCE FINANCIAL FL LLC, RF SERVICING MANAGEMENT CORPORATION d/b/a RELIANCE FINANCIAL, and ARYEH MILLER,<br>*Defendants.* | Case No.: ____________<br><br><br><br>**COMPLAINT** |

Plaintiffs Ultracare Family Wellness of NY, Inc. ('Ultracare'), Sharmin Khan Rita ('Rita'), and Amarbin Ahmed ('Ahmed') (collectively, 'Plaintiffs'), by their attorneys, Heskin & Proper, PLLC, allege against Defendants Rowan Advance Group LLC ('Rowan'), Eli Sklar ('Sklar'), Reliance Financial FL LLC ('Reliance'), RF Servicing Management Corporation d/b/a Reliance Financial ('RF Servicing'), and Aryeh Miller ('Miller') (collectively, 'Defendants'), upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This action arises from a coordinated merchant-cash-advance scheme that burdened a New York home-care provider with fixed, short-term, high-cost debt while falsely labeling the transactions purchases of future receivables.

2. The scheme was not directed by faceless entities. Defendant Eli Sklar is, upon information and belief, Rowan's principal and operational controller. Defendant Aryeh Miller publicly identifies himself as Reliance Financial's chief executive officer and is the executive who directs Reliance's platform, underwriting, origination, expansion, operations, and servicing.

3. Sklar and Miller designed, authorized, implemented, and ratified the standardized contracts, underwriting rules, fixed payment schedules, stacking practices, ACH controls, UCC filings, account-debtor notices, and coercive collection methods alleged below. They are the culpable persons who operated and managed the Rowan–Reliance Collection Enterprise through the corporate defendants.

4. Rowan and Reliance did not buy a contingent slice of Ultracare's future receipts. They advanced fixed sums, imposed fixed weekly debits that retired fixed balances in exactly 44 and 32 weeks, required personal guaranties, took blanket liens, and reserved the power to declare 100% of the undelivered balances immediately due.

5. The transaction sequence proves the point. Kapitus LLC funded Ultracare on December 1, 2025. BizFund, LLC funded Ultracare on January 16, 2026. Rowan then funded four days later, on January 20, 2026. Reliance funded on May 5 or 6, 2026 while the earlier positions remained outstanding.

6. Rowan and Reliance knew of the existing debt. Each required access to bank records and credit information. Each demanded a blanket security interest in the same receivables. Each contract represented that no prior agreement prohibited the new transaction. Reliance's own pre-funding form expressly asked whether Ultracare had balances with other cash-advance providers and warned that additional financing was a default.

7. Yet Rowan's disclosure left the line for prior balances blank, and Reliance's disclosure represented that $0.00 would be paid to prior funders. Reliance's verification page contains no responsive yes-or-no answers to its stacking questions—only a signer's name repeated in the answer fields.

8. The contradiction is deliberate. Reliance publicly advertises to brokers that it accepts a '7th' maximum position and 'stacked positions,' and requires four months of bank statements for

New York merchants. It therefore solicits and underwrites stacked transactions while its contract treats additional financing as a default.

9. That structure makes default—and the resulting acceleration—part of the product. A funder that knowingly enters behind existing positions cannot honestly treat the very stacking it approved as an unforeseen breach or as a reason to deny meaningful reconciliation.

10. Rowan's conduct is more stark. On October 7, 2025, a New York court dismissed Rowan's collection complaint with prejudice and held Rowan's materially identical form agreement to be a criminally usurious loan. *Rowan Advance Group LLC v. DraftPros, LLC*, 87 Misc. 3d 1215(A), 2025 NY Slip Op 51581(U), at *1–5 (Sup. Ct. Washington Cnty. Oct. 7, 2025).

11. Just over three months after that decision, Rowan used the same economic structure and the same operative clauses against Ultracare: a one-month, funder-controlled reconciliation; a fixed weekly debit; a 100% default percentage; sweeping rights against every account; a blanket UCC filing; and personal guaranties.

12. The documents also expose the supposed revenue estimates as fiction. Kapitus estimated monthly receipts of $684,059. BizFund estimated $672,704.83. Rowan's weekly debit and purchased percentage imply approximately $590,825 per month. Reliance, only months later, implied approximately $994,949 per month—an unexplained increase of approximately 68%, although its gross advance was only 10% larger than Rowan's and its stated purchased percentage was lower.

13. The payments varied with the size and payoff schedule of the advance, not with a good-faith estimate of Ultracare's receivables. Each debit was reverse-engineered to amortize a fixed obligation over a predetermined number of weeks.

14. When cash flow tightened, Defendants did not accept the risk that receivables might decline. They invoked UCC notices demanding that ElderServe Health Inc. divert all funds owed to Ultracare—far more than the 5.83% and 5.24% supposedly purchased—until Defendants' full accelerated demands were satisfied.

15. Defendants sent the notices to the same health-plan payor through the same collection counsel. Each notice demanded all funds, even though both demands could not simultaneously be honored and earlier secured claims already existed.

16. Defendants also obscured the true claimant in their financing statements. Each filing named 'C T Corporation System, as representative' as the secured party of record. Wolters Kluwer later admitted that C T Corporation held no interest in the collateral and had merely filed for Rowan or Reliance.

17. Defendants then used the resulting payment hold as leverage. After Plaintiffs' counsel warned that Ultracare would miss payroll unless the UCC holds were released, Defendants' common collection counsel demanded proof of the payroll need, 'a significant down payment,' and 'an acceptable settlement agreement' as the price of relief.

18. That communication confirms the function of the UCC notices: transform a purportedly contingent purchase into a fixed settlement obligation at the moment a healthcare provider is least able to resist.

19. The diverted receivables include or derive from services funded through Medicare and Medicaid. Federal law generally requires provider payments to be made to the provider and prohibits payment 'to or through a factor,' subject to narrow exceptions that do not authorize Defendants' claimed ownership and direct collection. 42 U.S.C. §§ 1395g(c), 1396a(a)(32); 42 C.F.R. §§ 424.73, 447.10.

20. Defendants' attempt to take all healthcare-plan payments threatens Ultracare's payroll, workforce, patient continuity, regulatory compliance, goodwill, and ability to provide essential home-care services. Those injuries cannot be repaired by a later damages award.

21. Plaintiffs seek declarations that the Rowan and Reliance instruments are loans, are criminally usurious and void, and confer no enforceable UCC, ACH, guaranty, or account-debtor rights; cancellation of the financing statements and notices; restitution and RICO damages; and preliminary and permanent injunctive relief barring further interference with Ultracare's healthcare receivables.

## JURISDICTION AND VENUE

22. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. §§ 1961–1968.

23. This Court has jurisdiction under 18 U.S.C. § 1964(c) over Plaintiffs' civil RICO claims and authority under 18 U.S.C. § 1964(a) to enter appropriate equitable relief.

24. This Court also has jurisdiction under 28 U.S.C. §§ 2201 and 2202 to declare the parties' rights and obligations under the challenged agreements, guaranties, ACH authorizations, financing statements, and payment notices.

25. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

26. An actual and immediate controversy exists. Defendants claim present rights to collect hundreds of thousands of dollars, enforce guaranties, debit bank accounts, maintain financing statements, and compel ElderServe and other payors to divert Ultracare's receivables. Plaintiffs deny that any such rights lawfully exist.

27. This Court has personal jurisdiction over Defendants because they purposefully transacted business in New York with a New York healthcare provider, funded New York transactions, took New York security interests, filed New York financing statements, directed New York account debtors to withhold New York receivables, and caused injury in this District.

28. Sklar personally directed Rowan's New York merchant-funding, underwriting, contracting, lien, and collection activity. Miller personally directed Reliance's nationwide origination platform and its underwriting, operations, and servicing, including the New York activity at issue here. Each Individual Defendant therefore purposefully caused business transactions and tortious injury in this District and may not invoke a corporate fiduciary shield. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467–74 (1988).

29. Rowan expressly selected New York law and authorized litigation in New York courts. Reliance expressly authorized New York proceedings to restrain or collect amounts it claimed due and provided that such collection proceedings would be governed by New York law.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Ultracare is located in this District, at least one Defendant resides in this District and a substantial part of the events, communications, transfers, liens, payment disruptions, and injuries occurred here.

**PARTIES**

31. Plaintiff Ultracare is a New York corporation and a licensed home-care services provider with operations in New York City and surrounding counties.

32. Ultracare furnishes home-health-aide and personal-care services, including services to elderly and disabled patients whose care is financed or administered through Medicare, Medicaid, managed long-term-care, and related government healthcare programs.

33. Ultracare depends on timely reimbursements to meet payroll for caregivers, preserve continuity of care, satisfy regulatory requirements, and maintain relationships with health plans and patients.

34. Plaintiff Rita is a New York resident, an owner of Ultracare, and a purported guarantor of both challenged transactions.

35. Plaintiff Ahmed is a New York resident, an owner of Ultracare, and a purported guarantor of the Rowan transaction.

36. Defendant Rowan is a limited liability company organized under New Jersey law and registered as a foreign limited liability company in New York under Department of State identification number 7375179.

37. Rowan maintains or has used addresses at 1130 Bedford Avenue, No. 68, Brooklyn, New York 11216 and 69 Marshall Drive, Edison, New Jersey 08817, markets merchant funding nationwide, and transacts substantial business in New York.

38. Defendant Sklar is a natural person who conducts business in New York and is Rowan's principal, owner, and operational controller.

39. The public-facing merchant-cash-advance website operating under the Rowan Advance name repeatedly instructs merchants and brokers to 'CONTACT ELI TODAY,' lists telephone number (516) 902-8593, and directs users to a scheduling page publicly titled 'Connect with Eli Sklar Today.'

40. A public business listing independently identifies the same (516) 902-8593 telephone number as belonging to Eli Sklar at 1350 Sixth Avenue, New York, New York 10019. The matching name, number, market, and Rowan-branded sales channel identify Sklar as the natural person directing Rowan's merchant-funding operation.

41. Sklar establishes Rowan's underwriting criteria; approves its standardized MCA form, purchased percentages, fixed payment schedules, reconciliation restrictions, guaranties, ACH authorizations, and default remedies; and directs or ratifies Rowan's UCC and collection strategy.

42. Sklar exercised that authority after *Rowan Advance Group LLC v. DraftPros, LLC* held Rowan's materially identical form to be a criminally usurious loan. He caused Rowan to continue originating and enforcing the same form rather than remove the provisions that made repayment absolute.

43. Defendant Reliance is a Florida limited liability company formed on June 18, 2024, with its principal address at 4601 Sheridan Street, Suite 600, Hollywood, Florida 33021.

44. Defendant RF Servicing is a Florida corporation and the authorized member of Reliance, according to Reliance's official Florida organizational filings.

45. RF Servicing owns, controls, manages, services, and collects for Reliance and does business under or through the 'Reliance Financial' name.

46. Reliance's collection notice used yet another variant—'RF Servicing Manager Corporation d/b/a Reliance Financial FL LLC'—while its website footer identifies 'Reliance Financial LLC.' These shifting names obscure which entity claims the debt and which entity owns or controls the asserted collateral.

47. Defendant Miller is a natural person and the chief executive officer, principal, and operational controller of Reliance Financial.

48. Reliance's own May 2025 public announcement identified Miller as its chief executive officer, described Reliance as 'led' by him, and attributed to him the company's platform, team, capital program, origination capacity, and nationwide revenue-based-financing strategy.

49. Reliance's December 2025 public announcement again identified Miller as chief executive officer and quoted him taking responsibility for 'our platform,' 'our underwriting,' strategic expansion, technology, personnel, capital, and the company's increased origination volume. The announcement described Reliance's hiring across underwriting, operations, and servicing as part of the growth Miller directed.

50. Miller establishes Reliance's underwriting and stacking policies; approves its standardized MCA form, revenue estimates, purchased percentages, fixed payment schedules, guaranties, ACH authorizations, and default provisions; and directs or ratifies Reliance's and RF Servicing's UCC, servicing, and collection conduct.

51. Reliance's official Florida filing identifies RF Servicing as its authorized member, and Reliance and RF Servicing share the same principal address. Miller's public control over Reliance's underwriting, operations, and servicing therefore extends, at minimum, to RF Servicing's conduct undertaken for Reliance.

52. Rowan, Reliance, and RF Servicing are referred to collectively as the 'Corporate Defendants.' Sklar and Miller are referred to collectively as the 'Individual Defendants.'

53. At all relevant times, each Corporate Defendant acted through its owners, officers, employees, brokers, underwriters, servicers, collection agents, and counsel and within the scope of those relationships.

54. At all relevant times, the Corporate Defendants and Individual Defendants acted as principals, agents, joint venturers, co-conspirators, and participants in an association-in-fact enterprise. Plaintiffs will amend to identify additional culpable persons and entities as discovery permits.

## FACTUAL ALLEGATIONS

### A. Ultracare's Healthcare Operations and Restricted Receivables

55. Ultracare is not a retail merchant with fungible credit-card sales. It is a regulated healthcare provider whose revenue arises from services delivered by caregivers to patients in their homes.

56. Those services generate receivables from managed-care organizations, health plans, and program payors, including ElderServe Health Inc., which operates RiverSpring at Home managed long-term-care and Medicare–Medicaid programs.

57. Ultracare's provider relationship with ElderServe requires ongoing performance, accurate claims administration, regulatory compliance, and the uninterrupted availability of caregiver staff.

58. A sudden interruption of reimbursements places patients and employees at immediate risk because Ultracare must fund payroll before or while claims are processed and paid.

59. Defendants knew Ultracare was a healthcare provider. The company's name, application materials, bank records, payor deposits, business descriptions, and underwriting documents made that fact unmistakable.

60. Defendants' forms nevertheless purported to sweep every present and future receipt, account, payment intangible, deposit, and proceeds thereof into their collateral and collection rights.

61. To the extent those assets include Medicare or Medicaid provider claims and payments, federal law prohibits their reassignment or payment to a factor except through narrow arrangements not present here. 42 U.S.C. §§ 1395g(c), 1396a(a)(32); 42 C.F.R. §§ 424.73, 447.10.

62. The Medicaid regulation defines a ‘factor’ as an organization that advances money to a provider for receivables assigned, sold, or transferred for a fee or deduction. 42 C.F.R. § 447.10(b). That definition describes Defendants’ asserted role.

63. The regulation permits a true billing agent only when payment is made in the provider’s name, compensation is tied to processing cost rather than the amount billed or collected, and compensation does not depend upon collection. 42 C.F.R. § 447.10(f). Defendants satisfy none of those limitations.

64. Instead, Defendants claim ownership for themselves, charge amounts derived from the face amount collected, and demand that payors remit directly to Defendants or their counsel. Section 447.10(h) expressly prohibits payment for provider services ‘to or through a factor, either directly or by power of attorney.’

65. The statutory history confirms that Congress enacted these provisions to prevent organizations from purchasing government-program receivables and collecting the claims or payments in their own names. *See Danvers Pathology Associates, Inc. v. Atkins*, 757 F.2d 427, 430 (1st Cir. 1985); *Polk v. Yee*, 36 F.4th 939, 946–49 (9th Cir. 2022).

66. A permissible administrative billing arrangement is fundamentally different because the billing service does not claim ownership of the government payment or receive it for its own account. *See Al-Shaikh v. State Department of Health Care Services*, 21 Cal. App. 5th 918, 929–32 (2018).

**B. The Stacking Sequence Was Visible to Both Defendants**

67. On or about December 1, 2025, Kapitus advanced $240,000 to Ultracare in exchange for a stated total payment of $351,750 and a weekly debit of $6,249.

68. Kapitus disclosed an estimated APR of 74.79%, estimated monthly income of $684,059, and an estimated term of one year and one month.

69. Kapitus filed a New York UCC financing statement on December 2, 2025 under filing number 202512027576162, naming ‘C T Corporation System, as representative’ and claiming broad collateral.

70. On January 16, 2026, BizFund advanced $250,000 to Ultracare in exchange for $347,500 and weekly debits of $6,682.69.

71. BizFund disclosed a 69.10% estimated APR, estimated monthly income of $672,704.83, and an estimated 13-month term.

72. BizFund’s agreement restricted additional receivables financing and represented that the receivables were free of undisclosed liens.

73. Only four days later, on January 20, 2026, Rowan purported to purchase the same pool of future receipts.

74. Rowan agreed to provide a gross purchase price of $250,000, deducted a $5,000 origination fee, and delivered net proceeds of $245,000.

75. In exchange, Rowan required Ultracare to deliver $349,750 through fixed weekly debits of $7,948.87 at a stated purchased percentage of 5.83%.

76. The Rowan schedule retires the stated purchased amount in exactly 44 weekly payments. That is a finite loan term, not an uncertain receivables purchase.

77. Rowan’s disclosure left the prior-balance payee and amount lines blank even though the Kapitus and BizFund obligations and liens existed or were readily discoverable.

78. Rowan’s agreement required Ultracare to warrant that the transaction did not conflict with any prior agreement, including any restriction on selling or pledging receivables.

79. Rowan had the right to review bank statements, account activity, credit information, and lien records. The recurring Kapitus and BizFund debits and the Kapitus financing statement were visible in ordinary underwriting.

80. Rowan's funding therefore created a stacked position that its own representations treated as prohibited from inception.

81. On May 5 or 6, 2026, while Kapitus, BizFund, and Rowan remained outstanding, Reliance purported to purchase the same pool of receipts.

82. Reliance agreed to a gross purchase price of $275,000, deducted a $13,750 origination fee, and delivered net proceeds of $261,250.

83. In exchange, Reliance required Ultracare to deliver $385,000 through fixed weekly debits of $12,031.25 at a stated purchased percentage of 5.24%.

84. The Reliance schedule retires the stated purchased amount in exactly 32 weekly payments.

85. Reliance represented that $0.00 would be paid to prior balances with Reliance and $0.00 would be paid to prior third parties.

86. Those representations were false. Kapitus, BizFund, and Rowan were visible in Ultracare's bank statements and public UCC record, and their aggregate weekly debits exceeded $20,000 before Reliance added another $12,031.25.

87. Reliance's pre-funding verification form specifically asked whether Ultracare was in arrears on loans or other financings, whether it had a balance with another cash-advance provider, and whether it understood that later financing was a default.

88. The form contains no substantive answers to those questions. It merely repeats Rita's name in the answer fields. Reliance funded anyway.

89. Reliance's contract prohibited additional financing and required a representation that performance would not violate prior agreements. Reliance therefore created and profited from the same condition it labeled a breach.

### C. Defendants Sized Fixed Loans, Not Good-Faith Purchases

90. The central figures across the sequence are summarized below. The stated or implied revenue estimates did not track Ultracare's actual expected receipts; the debits instead tracked the amount and desired payoff speed of each advance.

| Date / Funder | Gross Funding | Purchased Amount | Stated % | Weekly Debit | Monthly Revenue Estimate | Fixed Payoff |
|---|---|---|---|---|---|---|
| 12/1/25 Kapitus | $240,000 | $351,750 | 4.00% | $6,249.00 | $684,059 stated | ≈56.3 weeks |
| 1/16/26 BizFund | $250,000 | $347,500 | 4.30% | $6,682.69 | $672,704.83 stated | ≈52 weeks |
| 1/20/26 Rowan | $250,000 ($245,000 net) | $349,750 | 5.83% | $7,948.87 | ≈$590,825 implied | 44 weeks |
| 5/5/26 Reliance | $275,000 ($261,250 net) | $385,000 | 5.24% | $12,031.25 | ≈$994,949 implied | 32 weeks |

91. Rowan's implied monthly-receipts estimate follows directly from its own formula: $7,948.87 divided by 5.83%, annualized over 52 weeks and divided by 12 months, equals approximately $590,825 per month.

92. Reliance's same formula yields approximately $994,949 per month: $12,031.25 divided by 5.24%, annualized over 52 weeks and divided by 12 months.

93. Nothing in the documents explains why Ultracare's estimated receipts supposedly increased by approximately 68% between January and May 2026 while Reliance advanced only 10% more gross capital than Rowan.

94. The only coherent explanation is that Reliance selected a fixed 32-week collection horizon and reverse-engineered a supposed purchased percentage to fit its chosen weekly payment.

95. Rowan likewise selected a fixed 44-week horizon and reverse-engineered the 5.83% figure to fit the $7,948.87 debit.

96. Using the gross advance, Rowan charged $99,750 over approximately 44 weeks, an annualized simple rate of approximately 47.2%. Using the $245,000 actually delivered, Rowan charged $104,750, an annualized simple rate of approximately 50.5%.

97. Using the gross advance, Reliance charged $110,000 over 32 weeks, an annualized simple rate of approximately 65.0%. Using the $261,250 actually delivered, Reliance charged $123,750, an annualized simple rate of approximately 77.0%.

98. Fees and other consideration must be included when determining the true rate. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 336–37 (2021).

99. Both transactions exceed New York's 25% criminal-usury cap. Reliance's transaction also exceeds Florida's 45% felony-usury threshold, and Florida law provides that no extension of credit made in violation of its criminal-usury statute is enforceable. Fla. Stat. § 687.071(3), (7).

**D. Rowan Reused the Same Form After a Court Held It Criminally Usurious**

100. Before Rowan contracted with Ultracare, the Supreme Court, Washington County examined Rowan's materially identical 'Sale of Future Receipts Agreement.'

101. The court held that the agreement was 'nothing other than a loan,' calculated rates of 103.7% and 122.4%, declared the loan criminally usurious and void, and dismissed Rowan's collection complaint with prejudice. *Rowan Advance Group LLC v. DraftPros, LLC*, 87 Misc. 3d 1215(A), 2025 NY Slip Op 51581(U), at *1–5.

102. The court rejected Rowan's self-serving sale label and focused on the economic reality: Rowan became entitled to the full undelivered amount upon any breach, could sweep accounts unrelated to the purported purchased receipts, obtained guaranties, and imposed a finite schedule. *Id.*

103. The court specifically held Rowan's reconciliation illusory because it relied on a single month's statement, did not accurately measure the merchant's overall receipts or financial

condition, and depended on Rowan's subjective determination that the information was reasonable. *Id.* at *3 n.2.

104. Those are the same defects in Ultracare's January 20, 2026 Rowan form. Section 4 relies on one month of account information and allows Rowan to demand additional documents and decide whether the information has been reasonably verified.

105. The same default clause increases the specified percentage to 100% and makes the entire undelivered amount, fees, charges, collection costs, and attorneys' fees immediately due.

106. The same collection provisions let Rowan reach bank accounts and funds without limiting collection to the 5.83% of receipts supposedly purchased.

107. The same guaranty backs repayment with personal liability while the contract disclaims any real risk to Rowan.

108. And the same arithmetic creates an exact payoff term—44 weekly debits here, just as the form created an exact 20-week term in *DraftPros*.

109. Rowan therefore knew, before it funded Ultracare, that a New York court had found its form illusory, fixed, absolutely repayable, criminally usurious, and void.

110. Rowan nevertheless reused the form and later invoked the very acceleration and UCC powers the *DraftPros* court found inconsistent with a true purchase.

**E. Reliance Advertises Stacking While Its Contract Converts Stacking Into Default**

111. Reliance's public broker program confirms that its conduct was not an underwriting mistake. As of August 2026, Reliance advertised a '7th' maximum position and expressly described its program as accepting 'stacked positions.'

112. The same page stated that Reliance requires four months of bank statements from New York merchants and routes submissions directly to its underwriting team.

113. Reliance therefore markets to brokers that it will knowingly fund behind as many as six existing positions, while its merchant agreement treats additional financing as prohibited and a basis for default remedies.

114. That contradiction is material. A true purchaser evaluates the receivables it buys and bears the agreed risk that the receivables may be insufficient. Reliance instead evaluates how much fixed debt service can be extracted before predictable default.

115. Reliance's access to four months of bank statements revealed recurring debits to Kapitus, BizFund, and Rowan. Public financing statements revealed prior blanket claims. Its own verification form directed the underwriter to the same facts.

116. Reliance nonetheless stated that no prior balances would be paid and priced the transaction to require an additional $12,031.25 every week.

117. Reliance knew that the cumulative weekly burden, exceeding $32,000, would impair Ultracare's ability to meet payroll if healthcare reimbursements slowed or were delayed.

118. Reliance's stacking policy thus creates an immediate or inevitable contractual breach, gives Reliance a pretext to deny reconciliation, and triggers its right to raise the specified percentage to 100%, accelerate the full balance, impose a 33% collection charge, and seize accounts.

119. This is precisely how an MCA can be designed to result in default when receivables slow. *See Togut v. eProdigy Financial, LLC (In re Kossoff PLLC)*, 2026 Bankr. LEXIS 1850, at *24–45 (Bankr. S.D.N.Y. July 27, 2026).

120. Recent decisions likewise recognize that a purchased percentage and reconciliation label do not create a true sale where the funder's fixed draw and enforcement rights make repayment absolute. *See Golden Foothill Insurance Services, LLC v. Spin Capital, LLC*, 2025

U.S. Dist. LEXIS 160562, at *20–38 (S.D.N.Y. Aug. 19, 2025); *Lateral Recovery LLC v. Funderz.net, LLC*, 2024 U.S. Dist. LEXIS 176985, at *22–39 (S.D.N.Y. Sept. 27, 2024).

**F. Reconciliation Was Illusory and Default Was Engineered**

121. New York courts examine the transaction in its totality and ask whether the funder is absolutely entitled to repayment under all circumstances. *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 665–66 (2d Dep't 2020).

122. The customary factors—meaningful reconciliation, an indefinite term, and recourse in bankruptcy—are guides, not talismans. The essential question remains whether the funder assumed genuine risk of nonpayment. *See Fleetwood Services, LLC v. Ram Capital Funding, LLC*, 2022 U.S. Dist. LEXIS 100837, at *28–45 (S.D.N.Y. June 6, 2022), *aff'd*, 2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023).

123. A reconciliation clause is illusory when the funder retains practical discretion, demands records that do not measure the relevant receivables, imposes conditions inconsistent with the merchant's circumstances, or can declare default before reconciliation occurs. *See Davis v. Richmond Capital Group, LLC*, 194 A.D.3d 516, 517–18 (1st Dep't 2021).

124. Rowan's reconciliation relied on a single month's account statement and 'reasonable verification' controlled by Rowan—the exact language condemned in *DraftPros*.

125. Reliance's reconciliation likewise required records selected by Reliance, looked backward over a limited period, adjusted only future debits, and left Reliance in control of verification while its default provisions could accelerate the full balance.

126. Neither agreement required an automatic true-up based on actual receipts. Neither required Defendants to refund overcollections. Neither required that the fixed weekly debit decline contemporaneously when Medicaid or managed-care reimbursements were delayed.

127. Both agreements permitted the funder to treat account changes, payment interference, representations, or additional financing as defaults independent of any actual receivables generated.

128. Upon any such default, each funder's purchased percentage became 100% and the entire face amount became due immediately, together with fees and collection costs.

129. The guaranties, blanket liens, broad ACH authorizations, and account-debtor notices further ensured collection from sources unrelated to the specified percentage of future receipts.

130. The fixed 44-week and 32-week schedules, combined with absolute default remedies, left Defendants with no genuine risk that the receivables purchased would not materialize. The purported reconciliation was window dressing.

131. Courts assessing substantially similar instruments have held that the presence of a nominal reconciliation procedure does not alter the loan's substance. *See People v. Richmond Capital Group LLC*, 80 Misc. 3d 1213(A), 2023 NY Slip Op 50975(U), at *5–11 (Sup. Ct. N.Y. Cnty. 2023), *aff'd as modified*, 246 A.D.3d 585 (1st Dep't 2026).

**G. Defendants Used Nominal UCC Filers to Obscure the Claimants**

132. On January 22, 2026, Rowan caused a financing statement to be filed with the New York Department of State under filing number 202601225095248.

133. The financing statement did not identify Rowan as the secured party of record. It identified 'C T Corporation System, as representative.'

134. On May 8, 2026, Reliance caused a financing statement to be filed under filing number 21260508026418-7.

135. Reliance's financing statement likewise identified 'C T Corporation System, as representative,' rather than Reliance or RF Servicing.

136. Wolters Kluwer later issued letters acknowledging that C T Corporation was only a service provider, held no interest in the collateral, and filed for Rowan or Reliance.

137. Although Article 9 may permit a representative to appear in a financing statement, Defendants used that nominal listing as part of a broader course of opacity: the public record did not disclose the actual funder, while subsequent collection notices used inconsistent Reliance entity names and demanded immediate diversion.

138. The nominal filings also concealed from account debtors and later creditors that two separate funders were asserting overlapping, full-sweep claims against the same healthcare receivables.

139. Neither Defendant disclosed in its notice the priority of the Kapitus filing, the competing BizFund claim, the other Defendant's overlapping demand, or any accounting that could establish the amount and identity of legitimately assigned receipts.

### H. Defendants Used Payment Holds and Payroll Duress to Demand a Fixed Settlement

140. Rowan debited 25 weekly payments of $7,948.87 through July 14, 2026, collecting $198,721.75.

141. A June 23 debit returned with code R01, meaning insufficient funds, and was paid two days later. A July 21 debit returned with code R08 after a stop-payment instruction.

142. Instead of measuring actual receipts or accepting the risk of diminished cash flow, Rowan accelerated its demand and asserted a balance of $188,785.31, including charges beyond the stated $151,028.25 undelivered purchased amount.

143. On July 24, 2026, Rowan caused a UCC notice to be sent to ElderServe demanding that ElderServe direct 'all funds' owed to Ultracare to collection counsel until $188,785.31 accrued.

144. On August 19, 2026, Reliance caused a substantially identical notice to be sent to ElderServe demanding ‘all funds’ until $330,859.38 accrued.

145. Reliance’s notice identified the claimant as ‘RF Servicing Manager Corporation d/b/a Reliance Financial FL LLC,’ a name that does not match the contracting entity, the official authorized member’s name, or the website footer.

146. Both notices demanded 100% of Ultracare’s receivables, not Rowan’s stated 5.83% or Reliance’s stated 5.24%.

147. The two full-diversion demands could not both be satisfied. If ElderServe sent all funds to Rowan, none remained for Reliance; if it sent all funds to Reliance, none remained for Rowan or the earlier secured claimant.

148. Defendants nevertheless used the same counsel to issue overlapping demands to the same payor without a priority determination, intercreditor agreement, judicial order, or commercially reasonable allocation.

149. On August 20, 2026, Rowan’s counsel followed up and instructed ElderServe that ‘[n]o further payments should be made to the Merchant until our client has been paid in full.’

150. The follow-up invoked *Worthy Lending LLC v. New Style Contractors, Inc.*, 39 N.Y.3d 99 (2022), but omitted that Article 9 does not validate a void underlying loan, establish priority among competing claimants, authorize collection of restricted healthcare payments, or excuse commercially unreasonable enforcement.

151. That evening, Plaintiffs’ counsel notified Defendants’ common collection counsel: ‘We need the UCCs released ASAP or they will miss payroll tomorrow.’

152. Defendants’ counsel did not simply request an accounting or propose receipt-based reconciliation. He demanded the amount on hold, proof of what Ultracare needed for payroll,

Ultracare's offers to resolve 'our balances,' and a plan including 'a significant down payment and an acceptable settlement agreement.'

153. The reference to 'our balances' confirms that the same agent was coordinating collection for Rowan and Reliance against the same merchant and the same receivables.

154. The demand exploited Defendants' knowledge that a healthcare provider faced an immediate payroll crisis. Defendants conditioned relief from the hold on converting their disputed, contingent 'purchases' into a fixed settlement obligation.

155. A settlement extracted under that pressure would eliminate even the nominal reconciliation right and memorialize the fixed repayment Defendants intended from the outset.

156. Defendants' conduct was undertaken in bad faith, for an improper coercive purpose, and in a commercially unreasonable manner.

**I. Sklar and Miller Personally Directed and Ratified the Scheme**

157. The challenged conduct required executive decisions: what standardized form to use; how to convert an advance into a fixed payment schedule; whether to fund behind known MCA positions; what revenue estimate to state; when to declare default; whether to demand 100% of a healthcare payor's remittances; and whether to condition release of the resulting hold on a fixed settlement.

158. Those decisions were not ministerial acts by unidentified employees. They implemented the business models publicly led by Sklar and Miller and were undertaken in the ordinary course of the Corporate Defendants' merchant-funding operations.

159. Sklar was Rowan's public-facing point of control for merchants and brokers. He authorized or approved Rowan's January 20, 2026 offer, its materially misleading revenue estimate, the reuse of the form condemned in *DraftPros*, the January 22 financing statement, the acceleration demand, and the July 24 and August 20 account-debtor notices.

160. Sklar knew that *DraftPros* had held Rowan's same structure criminally usurious and void. Rowan's deliberate reuse of that structure only months later was a policy choice made, approved, or ratified at the controlling-principal level.

161. Miller publicly claimed responsibility for Reliance's platform, underwriting, origination, technology, personnel, capital, operations, and servicing. He authorized or approved Reliance's New York stacking program, the May 2026 offer and $0.00 prior-balance disclosure, the fixed 32-week schedule, the May 8 financing statement, the August 19 notice, and the settlement leverage exercised through Reliance's servicer and collection agent.

162. Miller knew Reliance advertised stacked positions as deep as seventh position while its agreement treated additional financing as a default. That contradiction was an underwriting and product policy within the functions Miller publicly stated he directed.

163. The Individual Defendants had authority to stop the ACH debits, withdraw the UCC notices, correct the secured-party disclosures, honor genuine reconciliation, or abandon collection under instruments challenged as criminally usurious. They instead caused or ratified continued enforcement after receiving notice of the prior positions, the restricted healthcare receivables, the conflicting UCC demands, and Ultracare's imminent payroll crisis.

164. The Individual Defendants also stood to benefit personally through ownership distributions, compensation, increased origination volume, portfolio growth, and collections generated by the scheme.

165. The details of the Individual Defendants' internal directives, approvals, communications, compensation, and ownership interests are peculiarly within Defendants' possession. The allegations concerning those matters are therefore made upon information and belief and rest on the public operational admissions, transaction documents, coordinated enforcement, and course of conduct identified above.

166. By setting policy, approving the instruments and underwriting rules, directing or ratifying the challenged enforcement, and exercising authority over the Corporate Defendants' core functions, Sklar and Miller participated in the operation or management of the Enterprise itself. *See Reves v. Ernst & Young*, 507 U.S. 170, 179–85 (1993).

167. Sklar and Miller are liable for their own participation even though they acted through limited-liability entities. A corporate officer is personally liable for torts in which the officer participates or which the officer directs. *See American Express Travel Related Services Co. v. North Atlantic Resources, Inc.*, 261 A.D.2d 310, 311 (1st Dep't 1999).

**J. The Rowan–Reliance Collection Enterprise**

168. Rowan, Sklar, Reliance, RF Servicing, and Miller, together with brokers, underwriters, servicers, filing agents, and collection agents whose identities will be confirmed in discovery, formed an association-in-fact enterprise (the 'Rowan–Reliance Collection Enterprise').

169. The Enterprise had a common purpose: originate and collect high-cost, fixed merchant debt disguised as receivables purchases, then use ACH control, stacking defaults, blanket UCC filings, guaranties, and account-debtor pressure to secure full repayment.

170. The Enterprise had relationships among its participants. Rowan and Reliance funded the same merchant in stacked positions; used materially parallel forms and default mechanisms; used the same nominal UCC secured-party listing; retained the same collection counsel; targeted the same account debtor; and coordinated demands described by their agent as 'our balances.'

171. The Enterprise had sufficient longevity to pursue its purpose from at least January 2026 through the present and continues to maintain financing statements, collection demands, websites, broker channels, and asserted balances.

172. RF Servicing is Reliance's authorized member and controls Reliance's origination, servicing, branding, enforcement, and collection activity. Miller operates and manages that branch of the Enterprise through the authority he exercises over Reliance's platform, underwriting, operations, and servicing.

173. Sklar operates and manages Rowan's branch of the Enterprise through the authority he exercises over Rowan's origination, underwriting, contracting, ACH, UCC, and collection conduct.

174. The Enterprise had a decision-making structure. Sklar directed the Rowan branch; Miller directed the Reliance and RF Servicing branch; and the branches coordinated their account-debtor and settlement pressure through common agents and counsel.

175. Each Defendant was a RICO 'person' separate from the association-in-fact Enterprise and participated in the conduct of the Enterprise's affairs through underwriting, contracting, funding, ACH activity, UCC filing, account-debtor notices, settlement demands, and collection.

176. The Enterprise's collection of unlawful debt affects interstate commerce because the transactions used interstate banking and ACH networks, electronic-signature platforms, email, telephone systems, websites, credit reporting, out-of-state entities, and payments transmitted among New York, New Jersey, and Florida.

**K. Interstate Wires, Misrepresentations, and Collection of Unlawful Debt**

177. Defendants used interstate wires to transmit applications, contracts, disclosures, ACH authorizations, guaranties, verification forms, funding instructions, payment requests, account data, notices, and settlement demands.

178. On or about January 20, 2026, Rowan transmitted or caused to be transmitted its agreement and related documents electronically and represented that the transaction was a sale,

that the weekly amount estimated 5.83% of projected receipts, that Rowan assumed the risk of slowdown or failure, and that reconciliation was an important protection.

179. Those statements were false or misleading because Rowan had selected a fixed 44-week payoff, retained absolute default remedies, relied on the same one-month reconciliation already held illusory in *DraftPros*, and intended to collect the entire amount regardless of receivables.

180. Rowan also omitted that its same form had been adjudicated a criminally usurious loan and dismissed with prejudice just over three months earlier.

181. Upon information and belief, Sklar authorized, approved, or caused the Rowan transmission and omissions as part of the standardized product and underwriting system he controlled.

182. On or about January 20, 2026, Rowan caused $245,000 to be transmitted by interstate bank wire and thereafter initiated recurring ACH debits as part of collecting the unlawful debt.

183. On or about May 5 and 6, 2026, Reliance transmitted or caused to be transmitted its agreement, disclosure, verification form, guaranty, ACH authorization, and related documents electronically.

184. Reliance represented that the transaction was a sale, that the $12,031.25 weekly amount estimated 5.24% of average sales revenue, that Reliance assumed the risk of slowdown or business failure, that reconciliation protected Ultracare, and that prior third-party balances were $0.00.

185. Those statements were false or misleading because Reliance knew Ultracare had at least three prior positions, sized a fixed 32-week repayment, retained absolute default and 100%

collection remedies, and publicly advertised that it accepted stacked positions as deep as seventh position.

186. Upon information and belief, Miller authorized, approved, or caused the Reliance transmission and omissions as part of the platform, underwriting, origination, operations, and servicing system he publicly stated he led.

187. Reliance caused $261,250 to be transmitted through interstate banking channels and thereafter initiated recurring ACH debits as part of collecting the unlawful debt.

188. On January 22 and May 8, 2026, Defendants caused financing statements to be transmitted and filed electronically under a nominal secured-party name that concealed the actual claimant from the face of the public record.

189. On July 24, August 19, and August 20, 2026, Defendants caused UCC notices and follow-up demands to be transmitted by email or other interstate wires to ElderServe, directing it to withhold all payments from Ultracare.

190. On August 20, 2026, Defendants' agent used email to demand a significant down payment and acceptable settlement agreement after learning that the payment holds would cause Ultracare to miss payroll.

191. Upon information and belief, Sklar and Miller authorized, approved, ratified, or knowingly permitted those notices and the settlement demand within their respective branches of the Enterprise and retained the resulting leverage and claimed proceeds.

192. Each communication was incident to a scheme to obtain money or property by materially false or misleading representations and omissions concerning the nature, legality, priority, ownership, and enforceability of Defendants' claimed rights.

193. The Rowan and Reliance obligations are 'unlawful debt' under 18 U.S.C. § 1961(6) because they were incurred in connection with the business of lending money at rates usurious

under New York and, as to Reliance, Florida law, and at rates at least twice the generally enforceable New York rate.

194. The unlawful-debt collection was not isolated. Rowan reused a form already adjudicated criminally usurious, Reliance publicly solicits stacked positions as a regular program, and both employ standardized contracts, ACH systems, UCC filings, guaranties, and account-debtor notices capable of repetition against other merchants.

195. The related predicate acts share the same purposes, participants, methods, victims, and results and pose a threat of continued criminal activity. Defendants continue to market the product, maintain the liens, assert balances, and threaten collection.

**COUNT I**

**Civil RICO — 18 U.S.C. § 1962(c)**
**(Collection of Unlawful Debt and Pattern of Wire Fraud)**

196. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

197. Rowan, Sklar, Reliance, RF Servicing, and Miller are persons within the meaning of 18 U.S.C. § 1961(3).

198. The Rowan–Reliance Collection Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4), is distinct from each Defendant, and affects interstate commerce.

199. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity and collection of unlawful debt.

200. Sklar satisfied the operation-or-management test by directing Rowan's MCA origination, underwriting, form contracts, payment structures, ACH access, UCC filings, and collection policies and by authorizing or ratifying the Rowan acts alleged above.

201. Miller satisfied the operation-or-management test by directing Reliance's platform, underwriting, origination, technology, personnel, operations, and servicing and by authorizing or ratifying the Reliance and RF Servicing acts alleged above.

202. Defendants collected and attempted to collect unlawful debt within the meaning of 18 U.S.C. § 1961(6) through ACH debits, accelerated demands, guaranties, UCC filings, account-debtor notices, and settlement pressure.

203. Defendants also committed and caused multiple acts indictable as wire fraud under 18 U.S.C. § 1343 by using interstate wires in furtherance of the scheme alleged above.

204. The wire fraud was pleaded with particularity, including the January 20, May 5–6, January 22, May 8, July 24, August 19, and August 20, 2026 transmissions, the speakers and agents involved, the material falsehoods and omissions, and the property Defendants sought to obtain.

205. The predicate acts were related and posed open-ended continuity because Defendants use standardized programs and continue to market, originate, service, and collect the same type of transaction from other merchants.

206. Plaintiffs relied on Defendants' representations concerning a true sale, genuine risk transfer, good-faith revenue estimates, meaningful reconciliation, and disclosed prior balances by signing the instruments, permitting ACH access, and accepting the funds.

207. Defendants' conduct directly and proximately injured Plaintiffs' business and property, including unlawful payments, fees, impaired receivables, loss of use of funds, financing and payroll disruption, professional expenses, reputational injury, and costs incurred responding to the UCC holds.

208. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their actual damages, costs, and reasonable attorneys' fees.

## COUNT II

### Civil RICO Conspiracy — 18 U.S.C. § 1962(d)

209. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

210. Defendants knowingly agreed that one or more participants would conduct the Enterprise's affairs through collection of unlawful debt and a pattern of wire fraud.

211. The agreement is shown by their complementary stacked funding, parallel forms, common nominal UCC filer, common collection counsel, simultaneous full-diversion notices to the same account debtor, and collective demand to resolve 'our balances.'

212. Each Defendant knew the essential nature and scope of the scheme and agreed to facilitate its unlawful objective, even if each did not personally commit every predicate act.

213. Sklar and Miller manifested their agreement by directing and continuing their respective standardized MCA programs, accepting the benefits of stacked and fixed transactions, authorizing or ratifying overlapping collection activity, and declining to withdraw the payment holds after learning that common agents were using them to demand resolution of 'our balances.'

214. Overt acts in furtherance of the conspiracy include the contract transmissions, funding wires, ACH debits, UCC filings, acceleration demands, account-debtor notices, and payroll-linked settlement demand alleged above.

215. Plaintiffs were injured in their business and property by reason of the conspiracy and are entitled to relief under 18 U.S.C. § 1964(c).

## COUNT III
### Declaratory Judgment, Rescission, and Cancellation of Instruments

216. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

217. The Rowan and Reliance transactions are loans because Defendants were absolutely entitled to repayment: the amounts and terms were fixed, reconciliation was illusory, default raised the purchased percentage to 100%, collateral and ACH rights reached assets beyond actual receipts, and personal guaranties shifted the risk back to Plaintiffs.

218. A transaction's substance, not its label, controls. *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d at 665–66; *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d at 334–38.

219. The Rowan loan's annualized rate was approximately 47.2% on gross proceeds and 50.5% on net proceeds, excluding additional default and collection charges.

220. The Reliance loan's annualized rate was approximately 65.0% on gross proceeds and 77.0% on net proceeds, excluding its 33% collection charge and other fees.

221. The transactions violate New York Penal Law § 190.40 and are void ab initio under New York law. *Adar Bays*, 37 N.Y.3d at 333–38.

222. The Reliance transaction also violates Florida Statutes § 687.071(3), and Florida Statutes § 687.071(7) makes the extension of credit unenforceable.

223. Because the underlying debts are void, the guaranties, ACH authorizations, security interests, UCC financing statements, account-debtor notices, arbitration provisions, fee provisions, and enforcement rights that depend on them are likewise void or unenforceable.

224. The instruments are independently unenforceable to the extent they purport to sell, assign, or direct payment of Medicare or Medicaid provider claims to a factor in violation of 42 U.S.C. §§ 1395g(c), 1396a(a)(32) and 42 C.F.R. §§ 424.73, 447.10.

225. An actual controversy exists because Defendants continue to assert present rights under the instruments and to interfere with Ultracare's receivables.

226. Sklar and Miller, as the persons directing and ratifying the Corporate Defendants' assertion of those rights, are necessary and proper parties to complete declaratory and injunctive relief and possess no independent right to enforce or benefit from the void instruments.

227. Plaintiffs are entitled to a declaration that the transactions are loans; that the loans are criminally usurious and void; that no Defendant owns Ultracare's receivables; that the

guaranties and ACH authorizations are void; and that the financing statements and notices must be terminated, withdrawn, and cancelled.

## COUNT IV
**Fraud and Fraudulent Inducement**

228. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

229. Rowan and Sklar, and Reliance, RF Servicing, and Miller, made, authorized, approved, or caused the specific written and electronic misrepresentations identified above concerning the nature of the transactions, the source and good faith of the revenue estimates, the transfer of risk, the absence or treatment of prior balances, the availability of reconciliation, and Defendants' entitlement to collect.

230. Rowan also concealed that a New York court had already held its materially identical form criminally usurious and void.

231. Reliance concealed that its regular program affirmatively accepted stacked positions as deep as seventh position while its form treated stacking as a breach and gateway to acceleration.

232. The misrepresentations and omissions concerned then-existing facts and Defendants' present intentions, including the underwriting data they reviewed, the prior positions they knew existed, the fixed terms they selected, and their intention to collect the full face amount regardless of actual receipts.

233. Defendants knew the representations were false or acted with reckless disregard for their truth because they created or approved the forms, selected or approved the payment schedules, controlled underwriting, reviewed or had access to the bank and UCC data, and designed or ratified the enforcement mechanisms.

234. Sklar's knowledge and fraudulent intent are further shown by his control of Rowan when it reused the same form after *DraftPros*. Miller's knowledge and fraudulent intent are further shown by his public control of Reliance's underwriting and platform while the company simultaneously solicited deep stacked positions and represented that prior balances were $0.00.

235. Defendants intended Plaintiffs to rely on the representations by executing the agreements and guaranties, accepting the advances, granting account access, and refraining from seeking lawful alternatives.

236. Plaintiffs reasonably relied in the context of documents that repeatedly described reconciliation as an important protection and expressly stated that Defendants assumed the risk of business slowdown or failure.

237. As a direct result, Plaintiffs suffered actual damages including unlawful payments and fees, encumbered assets, disrupted healthcare receivables, lost use of funds, costs of responding to account-debtor demands, and impairment of business operations.

238. Defendants' conduct was intentional, willful, morally culpable, and directed at the public and other merchants through standardized programs, warranting punitive damages under applicable law.

## <u>COUNT V</u>

### Bad-Faith Enforcement, Breach of the Covenant of Good Faith and Fair Dealing, and Article 9 Violations
### (Against the Corporate Defendants; N.Y. U.C.C. §§ 1-304, 9-607(c), and 9-625)

239. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

240. This count is pleaded in the alternative if any portion of either agreement or security interest is held enforceable.

241. Every contract and duty within the UCC imposes an obligation of good faith in performance and enforcement. N.Y. U.C.C. § 1-304.

242. The challenged agreements' notice, security-interest, collection, reconciliation, and default clauses supplied express contractual duties that the Corporate Defendants were required to perform honestly, in good faith, and consistently with the parties' stated bargain.

243. A secured party that enforces an account and is entitled to charge back uncollected amounts or has recourse against the debtor must proceed in a commercially reasonable manner. N.Y. U.C.C. § 9-607(c).

244. Article 9 authorizes a court to restrain collection or enforcement when a secured party is not proceeding in accordance with Article 9 and permits damages for resulting loss. N.Y. U.C.C. § 9-625(a), (b).

245. The Corporate Defendants acted in bad faith and commercially unreasonably by asserting rights under void, criminally usurious instruments; demanding 100% of all ElderServe payments instead of the stated percentages; failing to identify the receipts actually purchased; ignoring prior liens and priority; and issuing simultaneous, incompatible demands.

246. The Corporate Defendants further acted in bad faith by using nominal secured-party names and shifting Reliance entity names; failing to provide a transparent accounting; attempting to collect federally restricted healthcare payments; refusing meaningful reconciliation; and leveraging a known payroll crisis to demand a down payment and fixed settlement.

247. Sklar and Miller directed, approved, or ratified that conduct, as alleged above, and are independently liable under the RICO, fraud, tortious-interference, and equitable-relief counts.

248. The conduct destroyed Plaintiffs' rights to the fruits of any purported bargain, including the stated allocation of receivables risk and the supposed reconciliation protection.

249. The bad-faith notices interfered with Ultracare's payment relationship, increased the cost and reduced the availability of alternative financing, impaired payroll, and caused additional professional and operational expense—the very losses recognized by N.Y. U.C.C. § 9-625(b).

250. Plaintiffs are entitled to actual and consequential damages, cancellation and correction of the notices and filings, injunctive relief under N.Y. U.C.C. § 9-625(a), and all other available remedies.

## COUNT VI

### Tortious Interference With Contract and Business Relations

251. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

252. Ultracare has valid contracts and continuing business relationships with ElderServe, its other health-plan payors, caregivers, employees, patients, and vendors.

253. Defendants knew of those relationships because they reviewed Ultracare's business and bank records and specifically targeted ElderServe as an account debtor.

254. Defendants intentionally interfered by directing ElderServe to withhold all funds, falsely or misleadingly asserting an unqualified present right to the payments, concealing competing claims and priority defects, and threatening double liability.

255. Upon information and belief, Sklar directed, approved, or ratified Rowan's July 24 and August 20 notices, and Miller directed, approved, or ratified Reliance's and RF Servicing's August 19 notice and their continued use of the resulting hold as settlement leverage.

256. Defendants used wrongful means, including collection of criminally usurious debt, fraudulent representations and omissions, commercially unreasonable UCC enforcement, claims to restricted Medicare and Medicaid payments, and economic pressure tied to payroll.

257. Defendants intended to disrupt the relationships and use the resulting distress to compel accelerated payment and a fixed settlement.

258. The interference caused or threatens breaches, withheld payments, payroll disruption, increased operating costs, lost goodwill, impaired financing, and interruption of healthcare services.

259. Plaintiffs are entitled to compensatory and punitive damages and injunctive relief.

## COUNT VII

### Declaratory and Injunctive Relief Concerning UCC and Healthcare-Payor Collection

260. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

261. Defendants continue to maintain financing statements and payment notices and claim the right to seize Ultracare's bank accounts and health-plan receivables without a judgment.

262. Plaintiffs are likely to succeed because the agreements are fixed, absolutely repayable, criminally usurious loans; Rowan's same form has already been so adjudicated; Reliance admits it underwrites stacked positions; and federal law prohibits payment to or through a factor of covered provider claims.

263. Ultracare faces immediate and irreparable harm from any continued hold or diversion, including missed payroll, caregiver departures, interrupted patient care, loss of contracts and goodwill, regulatory consequences, and destabilization of essential healthcare operations.

264. Those injuries are not fully measurable in money and cannot be adequately repaired after trial. A later damages award cannot restore interrupted care, lost employees, patient confidence, or regulatory standing.

265. The balance of hardships favors Plaintiffs because an injunction would merely preserve the status quo and require Defendants to litigate their disputed claims, while continued diversion threatens Ultracare's ability to operate.

266. The public interest favors uninterrupted delivery of home-care services and compliance with federal Medicare and Medicaid payment restrictions.

267. Plaintiffs are entitled to a declaration that Defendants have no right to direct ElderServe or any other healthcare payor to remit Ultracare's funds to Defendants or their agents.

268. Plaintiffs are further entitled to preliminary and permanent injunctions requiring Defendants to withdraw their notices; refrain from sending further notices or ACH debits; refrain from contacting payors to collect the challenged debts; and file termination statements or amendments necessary to remove the asserted liens.

269. Because Sklar and Miller direct or control the persons carrying out those acts, any injunction should bind them personally and bind their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice.

## COUNT VIII
### Money Had and Received and Unjust Enrichment
### (Pled in the Alternative)

270. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

271. This count is pleaded in the alternative to the extent the challenged agreements are void or otherwise do not govern the parties' dispute.

272. The Corporate Defendants received and retained payments, fees, and benefits from Plaintiffs under transactions that were criminally usurious, fraudulently induced, illegal as applied to restricted healthcare receivables, and unenforceable.

273. Sklar and Miller received direct benefits from the unlawful transactions and collections through ownership distributions, executive compensation, profit participation, increased enterprise value, or other payments tied to the origination and collection activity they directed.

274. Equity and good conscience do not permit Defendants to retain amounts collected as interest, fees, default charges, collection charges, or proceeds of unlawful enforcement.

275. Plaintiffs are entitled to restitution, disgorgement, prejudgment interest, and an accounting of every amount Defendants received, transferred, credited, withheld, or claimed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

i. Declaring that the Rowan and Reliance transactions are loans, not true purchases of receivables;

ii. Declaring that the loans are criminally usurious, void ab initio, and unenforceable;

iii. Declaring that the guaranties, ACH authorizations, arbitration provisions, security interests, financing statements, account-debtor notices, default charges, and collection rights dependent on the void loans are likewise void and unenforceable;

iv. Declaring that Defendants do not own and may not receive Medicare or Medicaid provider payments prohibited from reassignment or payment to a factor;

v. Preliminarily and permanently enjoining Defendants and all persons acting with them from debiting Plaintiffs' accounts, sending or enforcing account-debtor notices, directing payors to divert Ultracare's funds, or otherwise collecting the challenged obligations;

vi. Directing Defendants immediately to withdraw all notices sent to ElderServe and other payors and to file all termination statements, amendments, and releases necessary to cancel the challenged UCC filings;

vii. Awarding Plaintiffs their actual damages, trebled under 18 U.S.C. § 1964(c), in an amount to be determined at trial;

viii. Awarding restitution and disgorgement of all unlawful payments, interest, fees, charges, and proceeds received by Defendants;

ix. Awarding consequential and punitive damages to the fullest extent permitted by law;

x. Awarding prejudgment and post-judgment interest;

xi. Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees under 18 U.S.C. § 1964(c) and other applicable law; and

xii. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: New York, New York
August 21, 2026

HESKIN & PROPER, PLLC
By: /s/ Shane R. Heskin
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, New York 10022
(917) 362-1313
shane@heskinproper.com
*Attorney for Plaintiffs*